1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

ADAM PEREZ, on behalf of himself and
the general public,

                               Plaintiff,

     vs.

COSTCO WHOLESALE
CORPORATION,

                            Defendant.

CASE NO. 13CV1687-LAB (BGS)

**ORDER GRANTING MOTION TO
DISMISS**

     Plaintiff Adam Perez brought this action on behalf of himself and the general public, alleging that Defendant Costco Wholesale Corporation unfairly profits by selling foods containing trans fats to restaurants. This is not a class action or mass action. Perez is bringing his own claims only, but is seeking attorney's fees under California's Private Attorney General Act. His claims arise under state law only, and the complaint invokes diversity jurisdiction.

     The Court, mindful of its obligation to examine its own jurisdiction and raise the issue, *see Moore v. Maricopa Cnty. Sheriff's Office,* 657 F.3d 890, 894 (9th Cir. 2011), raised the issue of Article III standing in two orders to show cause (Docket nos. 4, 13), to which Perez filed responses without amending his complaint. The Court discharged its orders to show cause, noting that defects in standing or other complaints in the defect could be tested by adversarial proceedings. Costco then moved to dismiss, both for lack of standing and on the

1  merits. The Court received briefing and held a hearing on that motion, and now issues its

2  decision.

3  **Perez's Claims**

4        Perez is suing Costco under California's Unfair Competition Law, Cal. Bus. & Prof.

5  Code §§ 172000, *et seq.* for selling certain trans fat-containing foods that, in turn, he alleges

6  are served in restaurants. California Health & Safety Code § 114377 forbids food facilities

7  to sell food containing artificial trans fat.[1] But under § 114377(b) and (c), food sold or served

8  in a manufacturer's original, sealed package is not subject to the ban.   The complaint

9  identifies five particular brands and varieties of food products sold in Costco's four Business

10  Center locations in California, which it alleges contain trans fat. These products are types of

11  clam chowder, butter flavored shortening, cream puffs, margarine, and chocolate chunk

12  cookies (collectively, the "Products"). All are sold in their original manufacturer's packaging.

13        While the Court looks first to the complaint to determine what Perez's claims are, it

14  has also had the benefit of his responses to the orders to show cause, and his argument at

15  the hearing. Although he never formally amended the complaint, he did clarify the nature of

16  his claims and abandon some theories in the course of briefing and argument.

17        The complaint pursues two theories of liability. First, it argues that Costco should be

18  treated as falling in the same category as restaurants, because its business locations have

19  snack bars. But the regulations applicable to grocery stores or supermarkets, the definition

20  of "food facility" set forth in Cal. Health & Safety Code § 113789, would seem to include both:

21  "'Food facility' means an operation that stores, prepares, packages, serves, vends, or

22  otherwise provides food for human consumption at the retail level . . . ." § 113789(a). The

23  meaningful distinction appears to be whether the products are sold in manufacturer's

24  packaging, not what kind of business the facility is engaged in. *See* § 114377(b) and (c). Of

25

---

26      [1] Although some trans fats occur naturally in food, the statute is concerned only with
artificial trans fats. Throughout this order, "trans fats" will be used to refer to the trans fats the
27  statute is aimed at, *i.e.*, artificial trans fats. The complaint does not always observe this
distinction, but at this stage of litigation, the Court draws all reasonable inferences in Perez's
28  favor. The Court therefore infers that the complaint's references to "trans fats" means
artificial trans fats.

1   course, given the large size of the Products, it is likely that buyers would use them rather
2   than reselling them in their original packages, but that does not shed light on the statute
3   itself.

4       Perez's argument also fails because he is not alleging any kind of harm as a result of
5   eating at the snack bars, and also because the snack bars do not serve any of the Products.
6   Furthermore, the statute exempts all sales of products in original manufacturer's packaging
7   without regard to where they are sold.

8       Perez's second theory of liability is that Costco is liable because it is causing or
9   assisting in violation of § 114377 by restaurants, possibly including restaurants where he
10  might be eating. This, he argues, results in the likelihood that he will eat trans fats.
11  Alternatively, he argues that the statute was intended to enable people to eat out without
12  worrying that they might be served food containing trans fats.

13  **Discussion**

14      Before proceeding to the merits, the Court is obligated to confirm its own jurisdiction.
15  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998). The most obvious
16  jurisdictional issue is standing, although Costco also argues the amount in controversy is not
17  met.

18      For purposes of ruling on a motion to dismiss for lack of standing, the Court accepts
19  all the complaint's material allegations as true. *See Metropolitan Washington Airports*
20  *Authority v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 264 (1991) (citing
21  *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). Although Costco asked the Court to take notice
22  of its product labels, these labels are not properly the subject of judicial notice. Costco made
23  the request in its reply to Perez's opposition to the motion to dismiss, and Perez had no
24  opportunity to oppose it. At argument, Perez's counsel was uncertain whether the labels
25  were the ones his client had seen, and it appeared they may have come from different
26  products than the ones identified in the complaint.

27      To show standing, Perez must show he suffered an injury in fact, *i.e.*, an invasion of
28  a legally-protected interest that is concrete and particularized, actual or imminent, and not

conjectural or hypothetical. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). The injury must be fairly traceable to the defendant's conduct, and likely, as opposed to merely speculative, that the injury would be redressed by a favorable decision. *Id.*

**Risk as Injury**

The complaint alleges that artificial trans fats are harmful, and there is no safe level of them. Eating any trans fats, it is alleged, increases the risk of heart disease, diabetes, certain types of cancer, Alzheimer's disease, cognitive decline, and other health conditions. Although the complaint speaks in broad terms, it refers to an increased *risk* of disease, not actual or imminent disease.  (*See* Compl., ¶¶ 10, 23, 31, 34, 35, 38, 41, 47, 48 (alleging risk of disease)). In other words, while some people who eat trans fats will develop these diseases as a result, eating trans fats would not inevitably cause Perez to develop one or more of these diseases. Perez cites *Stauber v. Shalala*, 895 F. Supp. 1178 (W.D.Wis., 1995) for the principle that an increased risk of harm from dangerous substances can give rise to standing. *Stauber*'s holding is more nuanced than this, however.

*Stauber* dealt with claims that the Food and Drug Administration had not properly approved a drug intended to enhance milk production in dairy cattle. The court found the drug's approval created two harms, sufficient to show standing under two different statutes. 895 F. Supp. at 1188. Alleged violation of the Food, Drug, and Cosmetic Act's required drug approval process made it impossible for the plaintiffs to know if the milk they were drinking was potentially dangerous, a right the Act was intended to safeguard. 895 F. Supp. at 1187–88.  Second, the court found a "reasonable risk" that dairy farmers would treat the drug's side effects with other dangerous drugs, increasing the risk of harmful drug residues in milk the plaintiffs drank.  *Id.* at 1188.

The first of these two harms is superficially similar to Perez's contention that he is suffering an injury because, when he eats out, he does not know whether he is eating trans fats. This will be discussed in connection with that theory of standing. The second harm — the one Perez cites *Stauber* for — is significantly different from the harm Perez alleges. In *Stauber*, the plaintiffs were drinking milk, and approval of the drug made it reasonably likely

the milk they were drinking would contain harmful residues. This is not a novel holding; other courts have reached the conclusion that a known increase of risk of harm can amount to a concrete injury. *See, e.g., Metropolitan Washington Airports*, 501 U.S. at 264–65 (relying in part on allegation that increased air traffic resulted in an increase in risks of accidents to show standing); *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1142–43 (9th Cir. 2010) (holding that the increased risk of identity theft was sufficient to confer standing); *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 859–60 (9th Cir. 2005) (finding sufficient injury where pier's expansion increased risk of oil spills). This is particularly true with regard to health risks. *See Sierra Club v. E.P.A.*, 754 F.3d 995, 1001 (D.C. Cir. 2014) (quoting *Natural Res. Def. Council v. E.P.A.*, 464 F.3d 1, 6 (D.C. Cir. 2006)) (noting that "health injuries often are purely probabilistic").

At the same time, for the standing requirement to mean anything, courts have recognized that remote or attenuated risks do not amount to a sufficient injury. In *Lujan*, for example, the increased risk that the challenged action might have injured the plaintiffs in the future was not enough. 504 U.S. at 564. The Ninth Circuit has made clear that the threat must be credible, *Krottner*, 628 F.3d at 1142–43, and substantial. *Central Delta Water Agency v. United States*, 306 F.3d 938, 949 (9th Cir. 2002). *See also Sierra Club*, 754 F.3d at 1001 (explaining that increased risk will only give rise to standing if it is nontrivial, substantial, and sufficient to take the suit out of the category of the hypothetical). Risks that rely on an attenuated chain of possibilities are not enough. *Id.* (*citing Clapper v. Amnesty Int'l USA,* 133 S.Ct. 1138, 1148 (2013)). *See also Nelson v. King County*, 895 F.2d 1248, 1251–52 (9th Cir. 1990) (holding that a determination of standing could not be based on "naked statistical assertion," but must be based on a "credible threat" of future harm).

**Degree of Risk**

The degree of risk that Perez, as a result of Costco's actions, will consume trans fats while eating out depends on two contingencies. First, restaurants in his area or where he is likely to go must buy one or more of the Products from Costco and use it in food. Second, he must order and eat foods containing one or more of the Products.

1    Perez argues that he might travel anywhere in the state and eat out, and therefore a

2    statewide injunction is necessary. But without any basis for showing this to be reasonably

3    likely, he is in the same category as the *Lujan* plaintiffs who intended some day to visit parts

4    of the world where they might be injured by alleged violations. *See Lujan*, 504 U.S. at 564.

5    The restaurants local to Perez, however, are a different story, because he alleges that

6    he regularly eats out. But here, he asks the Court to accept an attenuated chain of

7    contingencies as creating a substantial or reasonable probability. The Court brought this to

8    Perez's attention when it pointed out it would not be enough merely to show that Costco sells

9    to restaurants and Perez eats at restaurants. (*See* Docket no. at 2:23–24.) Perez responded

10   by arguing that because Perez lives and eats out near a Costco business center, the

11   "geographic nexus" creates a reasonable probability. (Response, Docket no. 14, at 3:12–20.)

12   While this is possible, it is difficult to say it is likely, given that the complaint says nothing

13   about other options available to these restaurants. The complaint did allege Perez eats at

14   restaurants supplied by Costco, but did not allege that any of those restaurants purchased

15   or used the Products.  Bearing in mind that Costco's business centers sell a wide variety of

16   business-oriented merchandise (*see* Complaint at 1 n.1), the fact that a restaurant purchases

17   some things from Costco does not create a substantial likelihood it buys any of the Products

18   at issue here from Costco. And at the hearing, Perez's counsel admitted he could not allege

19   how many restaurants were supplied by Costco.

20   It should also be remembered that the market for Costco's food items is not entirely

21   made up of restaurants, and also the statute applies only to "food facilities" and not other

22   businesses or organizations.  While the complaint suggests that most of its business center's

23   customers are businesses, and Perez's response to the first order to show cause suggests

24   the business center is "strongly targeted toward restaurant owners," (Docket no. 10 at 1 n.1),

25   it does not even indirectly attempt to allege what percentage of Costco business center's

26   customers are restaurants or other food facilities, nor how many of those customers have

27   bought the Products. Looking at the definition of "food facility" given in § 113789, there are

28   many types of businesses or entities that are considered food facilities, but many others that

serve food yet are not. Looking at §§ 113789 and 114377 together, it is easy to conceive of businesses or organizations that might purchase the Products at Costco that give rise to no legally cognizable injury to Perez. These include, for instance, those that legally resell the Products, those that are legally permitted to serve the Products (*e.g.,* nonprofits that occasionally serve or sell food, *see* § 113789(c)(3)), and those where Perez is unlikely to eat (*e.g.*, school cafeterias, commissaries, private dining facilities).

The chain of reasoning can be summarized as follows. A lot of businesses buy things from Costco's business center. Some of those businesses are restaurants. There are restaurants in Perez's area. Some of those restaurants are probably Costco customers. Of those, it is possible some are buying and serving the Products at issue here. Admittedly, there is some likelihood of this happening, but Perez has not shown it is a substantial or reasonable probability.

Turning to the Products themselves, the Court's second order to show cause pointed out that the risk is slim that Perez might unwittingly eat cream puffs, chocolate chunk cookies, or clam chowder of any kind. (*See* Docket no. 13 at 3 n.1.) The complaint never alleged Perez ate these foods, though if he did, it would be expected he would allege he did. At argument, the Court pointed out this same problem. Because Perez has twice been prompted to address this and has not done so, the Court infers he cannot truthfully allege he ate any of these foods, or that there is a danger he would unknowingly eat them at any restaurant. Another problem Perez never addressed is why injunctive relief is available to help him avoid these three foods, and why the solution of simply not ordering them in restaurants would not suffice.

This leaves just the margarine and shortening. Because these are commonly used as ingredients in other foods, it is possible that if a restaurant were using them, it might not be apparent. Assuming some of the restaurants where Perez eats bought the margarine or shortening from Costco, he might be in danger of unknowingly eating it.

Perez theorizes that many restaurant operators who shop at Costco's business centers do not know about the prohibition on use of trans fats, and might buy and use the

1   Products without knowing they cannot legally do so. Perez also argues they might not be

2   able to tell him whether the food they serve contains trans fats, even if he asks.  While it is

3   possible this might happen, the regulatory framework makes it unlikely.  Since January 1,

4   2010, food facilities in California have been forbidden to store or use margarine or shortening

5   containing trans fats. § 114377(b)(1).  And since January 1, 2011, no food of any kind

6   containing trans fats can be stored or used in food facilities. § 114377(b)(2). In other words,

7   accepting the allegation that the margarine and shortening contain trans fats, no restaurant

8   in California can legally use them, or even store them on premises (unless they are kept,

9   unopened, in the original manufacturer's packaging, as provided by § 114377(c)).

10  Furthermore, all food facilities must keep on their premises the labels for any fat, oil, or

11  shortening (or foods containing these) that they store, distribute, or use.  § 114377(a). At

12  argument, it was established that restaurant inspectors can inquire about and examine the

13  labels, and those who operate restaurants know they will be inspected periodically. *See* Cal.

14  Health & Safety Code § 114390 (providing for inspection of food facilities).  Furthermore,

15  Perez himself could ask to see the labels.

16      Assuming a restaurant where Perez eats, or is likely to eat, shops at Costco, a second

17  chain of contingencies must fall into place before he suffers an injury. First, the restaurant

18  must have need of one or more of the Products. Then, that restaurant's owner or operator

19  would have to not know about or be willing to ignore the statutory ban on trans fats, or fail

20  to look at the Product's label (which by law the restaurant must maintain). After that, the

21  restaurant's violation would have to escape detection by an inspector. While it's possible the

22  stars might align and these things might all take place, it does not raise the threat above a

23  conjectural or hypothetical level. *See Lujan*, 504 U.S. at 560; *Sierra Club*, 774 F.3d at 391.

24      This is not a case like those Perez cites, where plaintiffs were known to be (or about

25  to be) exposed to something that increased the risk of harm. *See Central Delta*, 306 F.3d at

26  948 (finding standing where planned release of water from reservoirs increased risk of

27  damage to crops).  Nor is it a case where the plaintiffs risked exposure to something that, if

28  it took place, would certainly cause harm. *See Ocean Advocates*, 402 F.3d at 859–60

1  (finding standing where pier expansion increased risk of oil spills, which, if they occurred,

2  would harm plaintiffs).  Instead, Perez's claim is that Costco's actions increase the risk that

3  he might be exposed to something that in turn increases the risk of harm — in other words,

4  an increased risk of increased risk of harm. This is too conjectural, too hypothetical, and not

5  imminent enough to amount to an injury in fact.

6        Perez's opposition implicitly acknowledges that he cannot allege that he ate at any

7  restaurant that bought one or more Products from Costco. (Opp'n to Mot. to Dismiss,

8  1:13–16.) He attempts to turn the tables by arguing that Costco has this information in its

9  records and knows it sold Products to restaurants, and which restaurants those are. But this

10 turns the pleading standard on its head. It is the plaintiff who is obligated to plead his case,

11 not the defendant. A knowing allegation amounting to "you know what you did" is not enough.

12 *See N. Am. Catholic Educ. Programming Found., Inc. v. Womble, Carlyle, Sandridge & Rice,*

13 *PPLC*, 887 F. Supp. 2d 78, 88 n.7 (D.D.C. 2012) ("Pleadings should not boil down to: 'You

14 did something wrong. You know what you did wrong. Now look through your files and refresh

15 your memory.'"); *In re Nelson*, 2014 WL 1347031, slip op. at *5 (Bkrtcy. D. Utah, Apr. 4,

16 2014) ("In essence, . . . the adversary complaint amount[s] to little more than this accusation

17 that the Plaintiffs level against Nelson: 'You know what you did.' This does not suffice.")

18        Perez's briefing and argument suggests he believes he finds himself in a Catch-22,

19 unable to plead his case without discovery, and unable to get discovery until he has pled a

20 case. No doubt many a plaintiff has felt the same way. But here, it is not impossible. Perez

21 could, for example, have learned of a restaurant where he ate food containing trans fats and

22 traced the food product back to the supplier. Had he done so, he might be able to plead a

23 claim against that supplier. What he may not do is speculate that a supplier might be selling

24 shortening or margarine containing trans fats to restaurants where he ate, make a claim, and

25 then obtain discovery to see if it is so. *See, e.g., In re Medtronic, Inc. Sprint Fidelis Leads*

26 *Products Liability Litigation*, 2009 WL 294353, at *2 (D.Minn., Feb. 5, 2009) (citing authority

27 for the principle that a plaintiff must adequately plead a claim before obtaining discovery).

28 / / /

1        **Fear or Uncertainty as Injury**

2        *Stauber* recognized that an injury in fact, sufficient to establish standing, could be the

3   inability to consume dairy products secure in the knowledge that they were free from

4   dangerous substances. The controversy was whether the Food and Drug Administration had

5   properly required the drug manufacturer to demonstrate the safety of the drug for use on

6   dairy cattle, as required under the Food, Drug, and Cosmetic Act. The opinion rejected the

7   defense argument against standing, that milk from cows treated with the drug was not

8   dangerous. But this case addressed deprivation of a statutorily-created procedural right,

9   namely a right to have drugs properly tested to confirm they will not have dangerous effects.

10  The fear or uncertainty that results from untested or improperly-tested drugs is an evil the Act

11  seeks to eliminate. Failure to properly test drugs that a plaintiff is likely to be affected by, in

12  other words, amounts to "an invasion of a legally protected interest which is . . . concrete and

13  particularized, and . . . actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S.

14  at 560 (citations, numbering, and quotation marks omitted).

15       Perez also cites a concurrence in *Covington v. Jefferson County*, 358 F.3d 626,

16  652–54 (9th Cir. 2004), for the principle that fear of various diseases as a result of ozone

17  depletion was an injury in fact. But the concurrence actually refers to the fear of "objective

18  and certain" risks that "will follow" from the complained-of actions. *Id.* at 653–54. The

19  concurrence also noted that Congress recognized and protected the right to be free from

20  such risks.

21       Here, Perez seeks to vindicate a right that California has decided not to give legal

22  protection to, namely the right to be free from risks that might occur from food containing

23  trans fats being sold in its original packaging. The parties did not address the legislative

24  history, and it may not be possible to know why the state made this decision. But it is clear

25  the state decided to provide protection under a different statutory scheme. Rather than trying

26  to regulate those sales, the state put the onus on the owners and operators of restaurants

27  and other food facilities. Not only are they forbidden to use or serve foods containing trans

28  fats, they must maintain product labels for oils, shortenings, and the like that they use. It is

1   this requirement that creates a right to be free from uncertainty or fear about trans fats in

2   restaurant food. Costco, of course, is exempt from this requirement insofar as it sells

3   products sealed in their original packaging.

4   **Amount in Controversy**

5   Though questions have arisen concerning the amount in controversy, Costco did not

6   brief it in depth. (*See* Mot. to Dismiss at 17 n.7.) Costco did, however, argue that some of

7   Perez's Private Attorney General Act and Unfair Competition Law claims are not allowed by

8   law, and that he cannot therefore proceed on behalf of the general public, nor obtain

9   attorney's fees under the Private Attorney General Act. *See* § 17203 (providing that a person

10  may pursue representative claims on behalf of others only if he meets the standing

11  requirements in § 17204); § 17204 (limiting standing to an injured person who has lost either

12  money or property as a result of the alleged unfair competition). *See Jenkins v. JP Morgan*

13  *Chase Bank, N.A.*, 216 Cal. App. 4th 497, 521 (Cal. App. 4 Dist. 2013) (explaining the

14  standing requirement of § 17204).  Because Perez does not allege he lost either money or

15  property, Costco argues, he will not be eligible for attorney's fees and the amount in

16  controversy is in doubt.

17  Perez conceded earlier that he did not purchase any of the Products from Costco, and

18  was not seeking to recover for money he spent on them. He responds to Costco's argument

19  by contending that he lost money as the result of buying food containing trans fats in

20  restaurants. But in fact, he does not know whether he lost this money, or if he did, when he

21  lost it and how much he lost. His briefing has focused on probabilities, not known facts, and

22  he cannot amend in good faith to allege this kind of loss  He appears to regard his argument

23  as sufficient, however, because he offers no explanation of how the amount in controversy

24  can be met if he is ineligible for attorney's fees.

25  Perez has therefore not met his burden of showing that the Court can exercise

26  diversity jurisdiction.

27  / / /

28  / / /

1          **Whether Perez Can Amend**

2          It is clear the complaint must be dismissed for lack of jurisdiction.  Ordinarily, a plaintiff

3    will be given leave to amend.  But Perez's arguments in briefing and at the hearing have

4    made clear he cannot amend to eliminate some of the problems with standing. That being

5    said, some discussion of the merits may be helpful, to show why amendment would be futile.

6          California's Unfair Competition Law provides for private rights of action to remedy

7    unlawful, unfair, or fraudulent business activities. *See Cel-Tech Communications, Inc. v. Los

8    Angles Cellular Telephone Co.*, 20 Cal.4th 163, 180 (1999). Perez has argued that Costco

9    is liable under the "unlawful" prong, for aiding and abetting restaurants' violation of § 114377,

10   and under the "unfair" prong, for creating serious health risks.

11         Aiding and abetting a violation can give rise to a claim, *see Velazquez v. GMAC

12   Mortg. Corp.*, 605 F. Supp. 2d 1049, 1068 (C.D.Cal., 2008), but this requires a showing that

13   the alleged aider and abettor knew the principal's conduct amounted to a breach of a duty,

14   and gave "substantial assistance or encouragement to the other so to act." *Id.* (*citing In re

15   First Alliance Mortgage Co.*, 471 F.3d 977, 993 (9th Cir. 2006)). It also implies participation

16   in the unlawful practices, *see People v. Toomey*, 157 Cal. App. 3d 1, 15 (Cal. App. 1 Dist.

17   1984), rather than mere failure to opt out. *See Emery v. Visa Int'l Serv. Ass'n*, 95 Cal. App.

18   4th 952, 962–64 (Cal. App. 3 Dist. 2002) (credit card company was not liable criminally or

19   under Unfair Competition Law for allowing merchants engaged in illegal sales to use its

20   payment system or for failing to stop their misuse of its logo). Even if there were any factual

21   allegations to support Costco's knowing what its customers would do with the products it

22   sold, a store's arm's-length sale of a product in the ordinary course of business generally

23   does not amount to substantial assistance or encouragement. *See id.* (citing cases).

24         Suits under the "unfair" prong are not allowed, if the legislature has provided a safe

25   harbor. *Cel-Tech*, 20 Cal.4th at 182. Failure to regulate is not, however, a safe harbor.  The

26   parties dispute whether the statutory scheme provides a safe harbor, or whether it merely

27   fails to regulate. California courts have clarified that, to qualify for *Cel-Tech*'s safe harbor

28   rule, the defendant must show that a statute explicitly prohibits liability for the defendant's

acts or omissions, or if state law precludes an action based on the conduct. *Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1379 (Cal. App. 2 Dist. 2012) (citing *Krumme v. Mercury Ins. Co.*, 123 Cal. App. 4th 924, 940 n. 5 (Cal. App.1 Dist. 2004)). Here, there is an explicit limitation on liability for the sale of products containing trans fats: if they are sold or served in a manfacturer's original, sealed package (as Costco does), the prohibition does not apply to them and selling them is not a violation of the law. § 114377(c). Perez argues that this should be treated as a failure to regulate, but the inclusion of this exemption in the same section that defines the violation makes it clear no liability attaches if this condition is met. It should also be noted that certain establishments are exempted from laws applicable to "food facilities," *see* § 113789, and can legally buy and use foods containing trans fats as well.   Treating the legal sale of foods containing trans fats as generally actionable would effectively gut both provisions.

Perez disclaims any reliance on an aiding and abetting theory under the "unfair" prong, and even if he had not, it would fall to the same analysis as under the "unlawful" prong. But without vicarious liability for the restaurants' actions, Perez can have no claim under this prong. Selling foods containing trans fats to restaurants might be unfair to the restaurants, but it is not unfair to him. If a restaurant bought the Products and later sued for a refund, or if another supplier's sales were being hurt by Costco's allegedly unfair sales, they might have a strong case. But without some theory of vicarious liability in play, a stranger to the transaction has no claim.

**Conclusion and Order**

The Court finds Perez lacks Article III standing, and his concessions show he cannot successfully amend his complaint to allege a cognizable injury in fact. He also failed to show, when challenged, that the amount in controversy was met. And even if he could plead facts to establish jurisdiction, amendment would be futile because his claims would fail on the merits.

/ / /

/ / /

1    The motion to dismiss is therefore **GRANTED** and this action is **DISMISSED** without

2    prejudice for lack of jurisdiction, but without leave to amend.

3

4    **IT IS SO ORDERED**.

5    DATED:  March 9, 2015

6

7    **HONORABLE LARRY ALAN BURNS**
     United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28